UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------x
NEW YORK DIALYSIS SERVICES,
INC.,

    Petitioner,

        -v-

NEW YORK STATE NURSES
ASSOCIATION,

    Respondent.
------------------------------------

17 Civ. 469 (JSR)

OPINION AND ORDER

JED S. RAKOFF, U.S.D.J.

This case concerns the arbitrability of a labor dispute that ripened more than two years after the parties' collective bargaining agreement expired in June 2014. In October 2016, following a series of delays, petitioner New York Dialysis Services, Inc. ("New York Dialysis") opened a dialysis facility that was originally intended to replace two facilities that had been staffed by members of respondent New York State Nurses Association (the "Association"). New York Dialysis has refused to apply the expired agreement at the new facility and to recognize the Association as the exclusive bargaining agent for registered nurses employed there. After the Association demanded arbitration of the dispute pursuant to the expired agreement's dispute resolution provisions, New York Dialysis moved to permanently stay such arbitration. Having carefully considered the parties' arguments and submissions, the Court hereby grants petitioner's motion and directs the entry of final judgment

1

permanently staying (and therefore, in effect, prohibiting) the arbitration.

Courts apply the summary judgment standard to motions to stay arbitration. Bensadoun v. Jobe-Riat, 316 F.3d 171, 175 (2d Cir. 2003) ("[T]he summary judgment standard is appropriate in cases where the District Court is required to determine arbitrability, regardless of whether the relief sought is an order to compel arbitration or to prevent arbitration."). "If there is an issue of fact as to the making of the agreement for arbitration, then a trial is necessary." Id.

The pertinent facts, undisputed except where noted, are as follows. New York Dialysis operates 41 dialysis clinics in New York State, including several in New York City. See Declaration of Courtney Cordon ("Cordon Decl."), ECF No. 11, ¶ 5. The Association is a labor organization representing approximately 40,000 registered nurses throughout the state. See Declaration of Rory D. Barthel, ECF No. 15, ¶ 4. For most of the past decade, New York Dialysis and the Association have entered multiple collective bargaining agreements covering distinct bargaining units in the New York City area. See Declaration of Eric C. Smith ("Smith Decl."), ECF No. 14, ¶ 5. At issue in this case is the collective bargaining agreement known as the "ABC CBA," because it governed the ABC bargaining unit.

The ABC CBA became effective on July 1, 2011 and expired on June 30, 2014. See ABC CBA, Ex. A to Cordon Decl., § 17. At the beginning of 2013, the agreement covered four facilities operated by

New York Dialysis and staffed by Association nurses: the Atlantic Hemodialysis Center (the "Atlantic Center"), the Brooklyn Kidney Center (the "Brooklyn Center"), the Atlantic Peritoneal Home Dialysis and Training Center (the "Atlantic Training Center"), and the Atlantic Hemodialysis at the Cobble Hill Nursing Home and Rehabilitation Center (the "Cobble Hill Center"). See id. at Preamble; Cordon Decl. ¶ 6; Smith Decl. ¶ 6. The ABC CBA provided that it would also apply to "any other location(s) to which the Employer [New York Dialysis] may move the existing operations" and that it "shall apply to any new or additional facilities of the employer [sic] under the same facility operating certificate." ABC CBA § 1. The agreement set forth detailed dispute resolution procedures that would culminate in arbitration conducted by the American Arbitration Association ("AAA") under the AAA's Labor Arbitration Rules. See id. § 13. The parties began negotiating a replacement to the ABC CBA before it expired in June 2014, but to date have not entered a new agreement. Cordon Decl. ¶ 8.

By summer of 2013, New York Dialysis was planning to open a new 50-chair dialysis facility located at 595 DeGraw Street in Brooklyn ("DeGraw"). Id. ¶¶ 9-10. DeGraw was intended to replace the 50 chairs that New York Dialysis then operated at the Atlantic Center (28 chairs) and the Brooklyn Center (22 chairs). Id. ¶ 9. DeGraw was also to replace the Atlantic Training Center, a small teaching office for home dialysis instruction. Id. ¶ 6, 10. To that end, New York Dialysis planned to simultaneously close the Atlantic Center

3

and Brooklyn Center, open DeGraw, and transfer the patients and staff from the closing facilities to DeGraw. Id. ¶ 10. New York Dialysis also considered transferring the Cobble Hill Center (a five-chair facility located at a nursing home) to DeGraw, but ultimately chose not to do so. Id. ¶ 16.

Before the ABC CBA expired, New York Dialysis informed the Association of its plans to replace these facilities with DeGraw. Id. ¶ 11. In particular, on May 21, 2014, New York Dialysis told the Association that it planned to open DeGraw and that Association nurses covered by the ABC CBA would be relocated there. Smith Decl. ¶ 8. Later that month, New York Dialysis and Association representatives jointly informed affected nurses of the planned transition to DeGraw, explained their interim work options, and told them that they would ultimately be able to move to DeGraw. Id. ¶ 9.

The DeGraw transition did not happen as planned. For reasons outside of New York Dialysis's control, DeGraw, which was initially supposed to open in December 2013, did not open until October 2016. The opening was first delayed because the New York City Department of Buildings decided to delay issuing necessary permits to the petitioner so that the petitioner's future landlord would pressure an existing tenant to obtain its own permits. Id. ¶ 12. Later, asbestos was discovered in the future DeGraw site and had to be removed. Id. New York Dialysis also had trouble obtaining enough electricity to run DeGraw. Id. Thus, as of spring 2016, there was still no opening date in sight. Id. ¶ 13.

4

During the delay period, the three facilities that New York Dialysis intended to transfer to DeGraw experienced serious setbacks of their own. On May 22, 2014, New York Dialysis was forced to close the Atlantic Center because the hospital where it was located closed. Id. ¶ 14. In August 2015, New York Dialysis was also forced to close the Brooklyn Center because its landlord sold the property and terminated New York Dialysis's lease. Id. Finally, during 2015, the Atlantic Training Center experienced a drop in patient census that led New York Dialysis to opt against transferring it to DeGraw for fear that still more patients would be lost. Id. ¶ 17.

The closure of the Atlantic Center was the only one of these events to occur before the ABC CBA expired. In June 2014, New York Dialysis and the Association entered an agreement (the "Atlantic Closure Agreement") under which Atlantic Center nurses were transferred to other New York Dialysis facilities. In that agreement, New York Dialysis acknowledged that it planned to transfer patients currently being treated at the Atlantic Center and the Brooklyn Center to DeGraw. See Atlantic Closure Agreement, Ex. A to Smith Decl., ¶ 4. The agreement also provided that Association nurses then employed at the Atlantic Center would have limited rights (so-called "recall rights") to be employed at other New York Dialysis facilities ahead of external hires. See id. ¶ 8. Although DeGraw was not specifically listed among the facilities to which the recall rights applied, the contract provided that the recall rights applied to "clinics within the [New York Dialysis/Association] ABC

5

. . . bargaining unit[]," see id., which, at that time, the parties believed would eventually include DeGraw. See Smith Decl. ¶ 8; see also ABC CBA § 1 ("It is agreed that this Agreement shall apply . . . at any other location(s) to which the Employer may move the existing operations . . . ."). However, all recall rights granted under this agreement terminated, at the latest, on May 22, 2015. See Atlantic Closure Agreement ¶ 8.[1]

The parties' collective bargaining agreement expired on June 30, 2014. See ABC CBA § 17. New York Dialysis and the Association have been negotiating a successor agreement ever since. Since that time, New York Dialysis has maintained "almost all" of the terms and conditions of employment set forth in the ABC CBA, Smith Decl. ¶ 11, but has not participated in the arbitration of any grievances, Cordon Decl. ¶ 28.

After the ABC CBA expired, New York Dialysis reiterated several times that it intended to open DeGraw as a replacement facility, and that Association nurses under the ABC CBA would be employed at DeGraw. See Smith Decl. ¶¶ 12-23. New York Dialysis's final representation that DeGraw would be a replacement facility was made on November 17, 2015, when New York Dialysis stated that DeGraw

---

[1] In July 2015, the parties entered a similar agreement (the "Brooklyn Closure Agreement") granting limited recall rights to Association nurses when the Brooklyn Center prematurely closed. See Ex. B to Smith Decl. Like the recall rights granted under the Atlantic Closure Agreement, the recall rights granted under the Brooklyn Closure Agreement expired before DeGraw finally opened in October 2016. See id. ¶ 4

6

would be a replacement facility for the Atlantic Training Center. Id. ¶ 23.

At some point after closing the Atlantic Center and the Brooklyn Center, New York Dialysis decided that DeGraw, when it finally opened, would be a new facility rather than a replacement facility. Cordon Decl. ¶ 18. New York Dialysis made this decision based on the passage of time, the loss of staff at the Atlantic Center and the Brooklyn Center, and the loss of most of the patients that had formerly been treated there. Id. The parties dispute when the Association first learned of New York Dialysis's change in plans. New York Dialysis claims that it told the Association of the new DeGraw plan at a meeting on April 25, 2016. See id. ¶ 19. The Association concedes that New York Dialysis proposed doing so at this meeting, see Smith Decl. ¶ 25, but claims that it was only unambiguously told that DeGraw would be opened as a new, non-replacement facility on June 16, 2016, see id. ¶ 28.

On May 26, 2016, New York Dialysis informed the New York City Department of Health that, because of the lapse of time and loss of patients, DeGraw would not be a "relocation" of other facilities, as it had originally stated in its permit applications. Cordon Decl. ¶ 20. The Department of Health instructed New York Dialysis to submit a new application to open a new dialysis clinic, and New York Dialysis did so on August 9, 2016. Id. ¶ 21. New York Dialysis received its operating certificate on October 24, 2016, and opened DeGraw on October 31, 2016. Id. ¶ 22. "No staff, patients, equipment

or supplies were transferred to DeGraw from any other [New York Dialysis-Association] facility, or any other [New York Dialysis] facility for that matter." Id. New York Dialysis did not offer employment to any Association members who had been covered by the ABC CBA. Smith Decl. ¶ 31.

On October 25, 2016, shortly before DeGraw opened, the Association filed an unfair labor practice charge against New York Dialysis with the National Labor Relations Board ("NLRB") alleging that New York Dialysis violated the National Labor Relations Act ("NLRA") by refusing to recognize the Association as the exclusive collective bargaining representative for DeGraw, by refusing to apply the ABC CBA to DeGraw, and by engaging in regressive bargaining. Cordon Decl. ¶ 23. On November 11, 2016, New York Dialysis filed an unfair labor practice charge of its own, alleging that the Association was violating the NLRA by demanding to be recognized as the exclusive bargaining representative for newly hired registered nurses at DeGraw and for insisting that the ABC CBA applied to DeGraw. Id. ¶ 24.

On November 16, 2016, the Association filed a grievance with New York Dialysis protesting its refusal to apply the ABC CBA to DeGraw, essentially duplicating one of the complaints it had previously submitted to the NLRB. Cordon Decl. ¶ 25; Smith Decl. ¶ 32. New York Dialysis denied the grievance on November 28, 2016. Smith Decl. ¶ 33. On December 21, 2016, the Association demanded,

pursuant to the expired ABC CBA, arbitration of its grievances before the AAA. Cordon Decl. ¶ 27. This lawsuit followed.

The parties agree that the ultimate question presented by New York Dialysis's motion to stay arbitration is whether the Association's grievance "has its real source in the contract" and may therefore be submitted to arbitration, even though it was filed after the ABC CBA expired. See Litton Fin. Printing Div., a Div. of Litton Bus. Sys., Inc. v. NLRB, 501 U.S. 190, 205 (1991). As a threshold issue, however, the Association argues that the Court should not reach this question, because the parties, by agreeing to rules providing that the arbitrator "shall have the power to rule on his or her own jurisdiction," see Labor Arbitration Rules § 3(a), "clearly and unmistakably" agreed to submit the arbitrability of post-expiration grievances to an arbitrator in the first instance. See AT & T Techs., Inc. v. Commc'ns Workers of Am., 475 U.S. 643, 649 (1986) ("Unless the parties clearly and unmistakably provide otherwise, the question of whether the parties agreed to arbitrate is to be decided by the court, not the arbitrator.").

The interesting legal question here raised is therefore whether a labor agreement that provides for arbitration of grievances pursuant to rules that give the arbitrator power to determine arbitrability clearly and unmistakably delegates to the arbitrator determination of the scope of arbitration, if any, that survives the expiration of the collective bargaining agreement itself. This

9

question was partially addressed by the Supreme Court in Litton, where it stated:

> The Union, and Justice STEVENS' dissent, argue that we err in reaching the merits of the issue whether the post-termination grievances arise under the expired agreement because, it is said, that is an issue of contract interpretation to be submitted to an arbitrator in the first instance. Whether or not a company is bound to arbitrate, as well as what issues it must arbitrate, is a matter to be determined by the court, and a party cannot be forced to arbitrate the arbitrability question. We acknowledge that where an effective bargaining agreement exists between the parties, and the agreement contains a broad arbitration clause, there is a presumption of arbitrability in the sense that an order to arbitrate the particular grievance should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute. But we refuse to apply that presumption wholesale in the context of an expired bargaining agreement, for to do so would make limitless the contractual obligation to arbitrate.

Litton, 501 U.S. at 208-09 (citations, alterations, and internal quotation marks omitted). This holding has been applied in subsequent Second Circuit decisions as well. See, e.g., Newspaper Guild/CWA of Albany v. Hearst Corp., 645 F.3d 527 (2d Cir. 2011); CPR (USA) Inc. v. Spray, 187 F.3d 245, 254-56 (2d Cir. 1999), abrogated in part on other grounds by Green Tree Fin. Corp. v. Randolph, 531 U.S. 79 (2000).

The Association nonetheless argues that Litton and its progeny do not govern this dispute because, here, the parties "clearly and unmistakably" delegated the arbitrability question to an arbitrator by agreeing to Labor Arbitration Rules (the "Rules") under which the arbitrator is expressly given authority to determine her own jurisdiction. See, e.g., Allscripts Healthcare, LLC v. Etransmedia

10

Tech., Inc., 188 F. Supp. 3d 696, 701 (N.D. Ill. 2016); Lapina v. Men Women N.Y. Model Mgmt., Inc., 86 F. Supp. 3d 277, 283-84 (S.D.N.Y. 2015).[2] But while such an argument might have force where the underlying contract had not itself expired – so that there was no question that there was in existence an agreement to arbitrate subject to rules that left to the arbitrator the determination of its scope – where the underlying contract has itself expired, the issue of whether the agreement to arbitrate has likewise expired is a pure question of the continued operation vel non of the contract itself (as opposed to the scope of the arbitration clause) and hence a question of contract law left to the courts.

In other words, the parties' agreement to arbitrate their dispute in accordance with the Rules does not clearly and unmistakably delegate to the arbitrator the determination of whether, after the contract has expired, the agreement to arbitrate still remains in any respect and, if so, to what extent. These are therefore questions for the Court to decide.

Turning to these questions, while the expiration of a collective bargaining agreement does not necessarily terminate the duty to arbitrate in all respects, nonetheless, as Litton holds, "[a] post-expiration grievance can be said to arise under the contract only where it involves facts and occurrences that arose

---

[2] While the Rules did not so provide at the time the ABC CBA was entered into, that agreement provided that the parties would be bound by amendments to the Rules, and the relevant amendment occurred before the ABC CBA expired.

11

before expiration, where an action taken after expiration infringes a right that accrued or vested under the agreement, or where, under normal principles of contract interpretation, the disputed contractual right survives expiration of the remainder of the agreement." 501 U.S. at 205-06.

Here, the Association argues that the DeGraw dispute arose under the contract under both the vested rights and facts and occurrences prongs. Turning first to the vested rights theory, the Association argues that New York Dialysis's decision not to apply the ABC CBA to DeGraw interferes with the recall rights that were granted to certain Association nurses under the June 2014 Atlantic Closure Agreement. Specifically, as noted above, that agreement provided that certain nurses employed at the Atlantic Center would have limited rights to be offered new positions at DeGraw when DeGraw eventually opened. See Atlantic Closure Agreement ¶ 8. By not offering positions at DeGraw to nurses who were formerly covered by the ABC CBA, the Association claims, New York Dialysis interfered with their vested rights.

Litton does not define the term "vested rights." However, Litton was itself a vested rights case, and therefore casts some light on what the Supreme Court had in mind. In that case, the Supreme Court held that a clause providing that "in case of layoffs, lengths of continuous service will be the determining factor if other things such as aptitude and ability are equal" did not create a vested right, because while seniority is a static concept,

12

aptitude and ability can vary over time, so that at any given point, it would be impossible to say what the precise order of layoffs would be. This provision therefore did not "freeze any particular order of layoff or vest any contractual right as of the Agreement's expiration." 501 U.S. at 210; see also Nolde Bros., 430 U.S. 243 (post-expiration grievance over accrued severance pay arbitrable under a vested rights theory).

Further, although the Second Circuit has not examined the vested rights prong of the Litton test, the Sixth Circuit has held that a right may be "vested" within the meaning of Litton only if one of two conditions is satisfied. First, "a court may use standard principles of contract interpretation to determine whether a right is vested," and thus "might conclude the parties intended a right to vest if [it is] shown contract language or extrinsic evidence to support that conclusion." Cincinnati Typographical Union No. 3, Local 14519, Comm'cns Workers of Am., AFL-CIO v. Gannett Satellite Info. Network, Inc., 17 F.3d 906, 910 (6th Cir. 1994). Second, "rights that can be worked toward or accumulated over time," such as severance or vacation pay, are generally presumed to be vested "without any other evidence in the contract." See id. at 911.

However, while Litton and Cincinnati Typographical Union suggest that a grievance might be arbitrable under the vested rights prong where the employer has interfered with a right that had been granted under the collective bargaining agreement itself, these cases provide little support for the Association's position that a

13

grievance can be arbitrated under the vested rights theory when the right in question was granted under an agreement collateral to the collective bargaining agreement. In other words, because the Atlantic Closure Agreement, and not the ABC CBA, is the source of the rights here at issue, it cannot be said that the ABC CBA "vest[ed] any contractual right as of [its] expiration," as needed to allow for arbitration thereunder. See Litton, 501 U.S. at 210.

Moreover, even assuming arguendo that rights granted under a collateral agreement might support a vested right argument, the recall rights at issue here were not in fact vested, because they expired long before New York Dialysis refused to employ nurses at DeGraw. The Atlantic Center recall rights lapsed on May 22, 2015, see Atlantic Closure Agreement ¶ 8, and New York Dialysis did not announce its intention to refuse to apply the ABC CBA to DeGraw until between April and June 2016, see Cordon Decl. ¶ 19; Smith Decl. ¶ 25, and did not actually refuse to do so until DeGraw opened on October 31, 2016, see Smith Decl. ¶ 31. Nor is there any argument that New York Dialysis deliberately dragged its heels to avoid complying with its obligations under the Atlantic Closure Agreement, which might arguably qualify as "interference" with a vested right. Instead, by agreement of the parties, the recall rights expired through no fault of New York Dialysis before DeGraw was opened. New York Dialysis's later refusal to honor the recall rights at DeGraw is therefore not an interference with vested rights, and New York

14

Dialysis cannot be forced to arbitrate the dispute under this theory.

The Association also contends that the DeGraw dispute is arbitrable because it "involves facts and occurrences that arose before expiration" of the ABC CBA on June 30, 2014. See Litton, 501 U.S. at 206. As with the "vested rights" language, the Second Circuit has not meaningfully interpreted the "facts and occurrences" language, but in a summary order it added the limited gloss that, to satisfy the "facts and occurrences" prong, the facts and occurrences "must give rise to the grievance at issue." Chelsea Grand, LLC v. N.Y. Hotel & Motel Trades Council, AFC-CIO, 629 F. App'x 152, 155 (2d Cir. 2015) (summary order).

In addition, a court in this district has addressed whether an employer can be forced to arbitrate a dispute over whether to apply an expired collective bargaining agreement to a transfer facility. See Halsey Drug. Co., Inc. v. Drug, Chem., Cosmetic, Plastics & Affiliated Indus. Warehouse Emps., Local 815, 192 F. Supp. 2d 192 (S.D.N.Y. 2002). In that case, prior to the expiration of the collective bargaining agreement, the employer resolved to close a manufacturing plant, told the union that the plant was to be closed, and transferred some operations to the new facility. Because "all the facts underlying the dispute (including the closing of the Brooklyn facility and the opening of a new facility in Congers) arose prior to March 31, 2000, which was the earliest possible

15

expiration date for the CBA," the court held that the dispute could properly be submitted to arbitration. Id. at 198.

Here, by contrast, the DeGraw dispute cannot be arbitrated under the "facts and occurrences" prong of the Litton test. As noted, the Association's complaints are that New York Dialysis failed to apply the ABC CBA to DeGraw after it finally opened and failed to recognize New York Nurses as the exclusive bargaining representative at DeGraw. But what "g[a]ve rise" to this grievance, see Chelsea Grand, 629 F. App'x at 155, cannot be separated from the key facts of DeGraw's history, most of which happened after the ABC CBA expired: the premature closures of both facilities DeGraw was chiefly intended to replace, the series of construction delays, and the loss of staff and patients alike.

In particular, the opening of DeGraw was repeatedly delayed for unforeseen reasons that were outside of New York Dialysis's control, so much so that it ultimately opened almost three years late, and almost two-and-a-half years after the ABC CBA expired. Other key facts likewise happened after the collective bargaining agreement expired. The recall rights granted under the Atlantic Closure Agreement expired in May 2015; the Brooklyn Kidney Center also closed prematurely, again for reasons outside New York Dialysis's control; and the recall rights granted under the Brooklyn Closure Agreement expired in July 2016. Thus, by the time DeGraw opened, its former patients and staff alike had moved on, and in no meaningful sense was DeGraw "replacing" the old facilities. See Cordon Decl.

16

¶ 22 ("No staff, patients, equipment or supplies were transferred to DeGraw from any other [New York Dialysis-Association] facility, or any other [New York Dialysis] facility for that matter.").

To be sure, some limited aspects of this dispute arguably arose before the collective bargaining agreement expired. New York Dialysis began planning to open DeGraw as a replacement for the Atlantic Center and the Brooklyn Center that would be governed by the ABC CBA at some point in 2013, told the Association as much by spring 2014, and accounted for the premature closing of Atlantic Center by giving nurses employed there limited rights to be recalled to DeGraw once it opened. But at that point, the dispute was still far too inchoate to conclude that it arose under the ABC CBA. As outlined above, the bulk of this dispute, and the facts that actually led to the grievance, did not arise under the ABC CBA, but after it expired.

Halsey illustrates why the Litton test is not satisfied here. Halsey held that the employer must arbitrate a grievance concerning whether to apply an expired collective bargaining agreement to a transfer facility where the old facility was closed and the new facility was opening during the term of the agreement. See 192 F. Supp. 2d at 198 (arbitration required where "all the facts underlying the dispute (including the closing of the Brooklyn facility and the opening of a new facility in Congers) arose prior to . . . the earliest possible expiration date for the CBA"). Here, by contrast, all that happened before the collective bargaining

17

agreement expired was that New York Dialysis announced its intention to replace Atlantic Center and Brooklyn Kidney Center with DeGraw and granted limited recall rights to certain nurses employed at the prematurely closing Atlantic Center.

For the foregoing reasons, the Court finds that New York Dialysis cannot be forced to arbitrate the DeGraw dispute under the expired ABC CBA. New York Dialysis's motion to permanently stay the arbitration demanded by the Association is therefore granted. The Clerk of Court is directed to enter final judgment in petitioner's favor and to close the case.

SO ORDERED.

Dated: New York, NY
May 28, 2017

JED S. RAKOFF, U.S.D.J.